# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| ALPHA TECH PET INC., ET AL., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Nos. 16 C 513 & 16 C 4321 |
| v. | ) | |
| | ) | |
| LAGASSE, LLC, ET AL., | ) | Judge Thomas M. Durkin |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION & ORDER

Plaintiff Alpha Tech Pet, Inc. alleges that defendants LaGasse LLC, Essendant Management Services LLC, Essendant Co., and United Stationers, Inc. ("defendants") sent Alpha Tech eight unsolicited fax advertisements in violation of the Telephone Consumer Protection Act of 1991 ("TCPA"), as amended by the Junk Fax Protection Act of 2005. R. 1. Alpha Tech also makes class allegations on behalf of others similarly situated. In December 2016, the Court consolidated Alpha Tech's case with another case pending in this district for pre-trial proceedings. R. 45. The other case, *Craftwood II, Inc. et al. v. Essendant, Inc.*, No. 16-cv-4321, asserts the same claims against Essendant and effectively seeks to represent the same class.[1]

The Alpha Tech and Craftwood plaintiffs ("plaintiffs") seek to certify classes of all persons and entities to whom Essendant sent fax transmissions from May 1, 2011 to May 1, 2015, which would implicate approximately 1.5 million faxes in 725

---

[1] Throughout this opinion, entries in the Alpha Tech docket, No. 16-cv-513, are referred to as R. __; entries in the Craftwood docket, No. 16-cv-4321, are referred to as "Craftwood Dkt. __."

separate transmissions to nearly 24,000 unique fax numbers. R. 71-2 ¶ 35; R. 71-3 ¶ 5. Plaintiffs propose dividing the class into three categories based on the content of the faxes. R. 96 at 4-5. Discovery closed a number of months ago, and on August 23, 2017, this Court adopted Magistrate Judge Valdez's August 1, 2017 ruling denying plaintiffs' motion to reopen discovery. R. 93.

Currently before the Court are two motions by defendants: (1) a motion to deny class certification (R. 70); and (2) a motion for judgment on the pleadings on portions of plaintiffs' individual claims (R. 67). The central basis of both motions is a recent change in the law. In March 2017, a split panel of the D.C. Circuit struck down a rule from the Federal Communications Commission ("FCC") rule requiring both unsolicited and solicited faxes to include opt-out notices with certain language. The D.C. Circuit held this rule, known as the "Solicited Fax Rule," "unlawful to the extent that it requires opt-out notices on solicited faxes." *Bais Yaakov of Spring Valley v. FCC*, 852 F.3d 1078, 1083 (D.C. Cir. 2017). It found that the TCPA's clear statutory text reached only unsolicited fax advertisements, meaning that the FCC did not have the authority to promulgate a rule regarding solicited faxes. *Id.* at 1082 ("Congress drew a line in the text of the statute between unsolicited fax advertisements and solicited fax advertisements.").

Since *Bais Yaakov* was decided earlier this year, several courts have found class certification inappropriate in TCPA cases where, "to determine whether any putative member of the proposed class had a TCPA claim, the Court would first be required to determine whether that proposed class member 'solicited' the faxes it

received." *Brodsky v. HumanaDental Ins. Co.*, 2017 WL 3704824, at *10 (N.D. Ill. Aug. 28, 2017) (Blakey, J.); *accord Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 467-74 (6th Cir. 2017), *as corrected on denial of reh'g en banc* (Sept. 1, 2017). This Court likewise finds *Bais Yaakov* binding and the individualized consent issues created by *Bais Yaakov* dispositive of plaintiffs' class certification claims. The Court therefore grants defendants' motion to deny class certification.

Because motions for judgment on the pleadings are technically improper when they pertain only to parts of claims, the Court denies defendants' motion for judgment on the pleadings. But the legal principles set forth in this opinion regarding the impact of *Bais Yaakov* apply equally to plaintiffs' remaining, individual claims.

## Analysis

## I.    Motion to Deny Class Certification

### A.    Standard

Although "in most cases involving a proposed class, it is the plaintiffs who move for class certification . . . under Fed. R. Civ. P. 23(c)(1), either party may ask the court to determine whether class certification is appropriate." *Blihovde v. St. Croix Cnty., Wis.*, 219 F.R.D. 607, 612 (W.D. Wis. 2003) (citing *Cook Cnty. College Teachers Union v. Byrd,* 456 F.2d 882, 885 (7th Cir. 1972) ("One opposing a class action may move for an order determining that the action may not be maintained as a class suit.") & 7AA Fed. Prac. & Proc. Civ. § 1785 (3d ed.) ("Either plaintiff or

defendant may move for a determination of whether the action may be certified under Rule 23(c)(1).")).

To be certified, a putative class must satisfy the four prerequisites of Federal Rule of Civil Procedure 23(a): numerosity, commonality, typicality, and adequacy of representation. *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 811 (7th Cir. 2012). The action also must satisfy at least one of the three subsections of Rule 23(b). *Id.* Here, plaintiffs seek certification under Rule 23(b)(3), R. 98, which requires a finding that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."

"Plaintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements." *Messner*, 669 F.3d at 811. "The Rule does not set forth a mere pleading standard"; rather, the plaintiff must satisfy Rule 23 "through evidentiary proof." *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013). "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim,'" *id.* at 33-34 (quoting *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 351 (2011)), but "[m]erits questions may be considered . . . only to the extent . . . that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 568 U.S. 455, 466 (2013).

District courts have "broad discretion" when determining whether a proposed class satisfies Rule 23. *Howland v. First Am. Title Ins. Co.,* 672 F.3d 525, 528 (7th

Cir. 2012); *see also Dukes,* 564 U.S. at 369 ("[M]ost issues arising under Rule 23 . . . [are] committed in the first instance to the discretion of the district court.").

## B. Application

Defendants argue plaintiffs cannot show that their proposed classes meet Rule 23's requirements in light of the individualized consent issues resulting from the D.C. Circuit's decision in *Bais Yaakov*. Plaintiffs respond that *Bais Yaakov* is not governing law in this circuit, and in any event, individualized consent issues do not defeat class certification (which they seek further discovery to help show). The Court disagrees on both fronts.

### 1. Impact of *Bais Yaakov*

Plaintiffs make three arguments as to why *Bais Yaakov* is not controlling or relevant here. *First*, plaintiffs claim that *Bais Yaakov* is binding only in the D.C. Circuit and not in this Circuit. The Sixth Circuit in *Sandusky* explained why this is not correct. In *Bais Yaakov*, the Judicial Panel on Multidistrict Litigation ("JPML") consolidated in the D.C. Circuit several petitions for review originally filed in multiple courts of appeals seeking to set aside the FCC's Solicited Fax Rule. *See Sandusky*, 863 F.3d at 464, 467. "Once the [JPML] assigned petitions challenging the Solicited Fax Rule to the D.C. Circuit, that court became 'the sole forum for addressing . . . the validity of the FCC's rule.'" *Id.* at 467 (quoting *Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008)). "And consequently, its decision striking down the Solicited Fax Rule 'became binding outside of the [D.C. Circuit].'"

*Id.* (quoting *Peck*, 535 F.3d at 1057 (holding that Eleventh Circuit's decision challenging FCC order is binding in the Ninth Circuit)).

As the *Sandusky* court further explained, "[t]his result makes sense in light of the procedural mechanism Congress has provided for challenging agency rules. *See* 28 U.S.C. §§ 2112, 2342-43. By requiring petitioners to first bring a direct challenge before the FCC, the statute allows this expert agency to weigh in on its own rules, and by consolidating petitions into a single circuit court, the statute promotes judicial efficiency and ensures uniformity nationwide." *Id.*; *accord CE Design Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 448, 450 (7th Cir. 2010) (consolidation of petitions into a single circuit court "allows uniform, nationwide interpretation" of FCC rules). The cases plaintiffs cite for general, "intercircuit stare decisis" principles are irrelevant here because *Bais Yaakov* did not arise through a standard appeal.

*Second*, plaintiffs claim that *Bais Yaakov* did not strike down the FCC's Solicited Fax Rule and instead was more limited in its holding. R. 96 at 11. But plaintiffs "misread[ ] the breadth of the D.C. Circuit decision." *Sandusky*, 863 F.3d at 467. The D.C. Circuit was clear and unequivocal: the "Solicited Fax Rule is unlawful to the extent that it requires opt-out notices on solicited faxes." *Bais Yaakov*, 852 F.3d at 1083; *accord* R. 71-1, Statement of FCC Chairman Ajit Pai (*Bais Yaakov* showed that "the FCC acted unlawfully" in its Solicited Fax Rule; "[g]oing forward, the Commission will strive to follow the law and exercise only the authority that has been granted to us by Congress"). "Thus, . . . the Solicited Fax

Rule itself . . . was struck down." *Sandusky*, 863 F.3d at 467. Plaintiffs emphasize that the FCC has not yet taken action on remand in *Bais Yaakov*. As defendants note, that fact is unremarkable given that a petition for certiorari has been filed. (Of course, if the Supreme Court grants certiorari and reverses the D.C. Circuit, this Court will reconsider its ruling.)

*Third*, plaintiffs say that under the Seventh Circuit's opinion in *Ira Holtzman v. Turza*, 728 F.3d 682, 683 (7th Cir. 2013), the TCPA itself extends the opt-out notice requirement to solicited faxes, regardless of the Solicited Fax Rule (and thus regardless of the *Bais Yaakov* decision). As the district court in *Brodsky* determined, however, "[t]his broad reading of *Turza* is not the law." 2017 WL 3704824, at *8.

"It is true that *Turza* cites the TCPA, rather than the Solicited Fax Rule, in support of the proposition that opt-out notices are required on solicited faxes." *Id.* (citing *Turza*, 728 F.3d at 683 ("Even when the Act permits fax ads—as it does to persons who have consented to receive them, or to those who have established business relations with the sender—the fax must tell the recipient how to stop receiving future messages." (citing 47 U.S.C. § 227(b)(1)(C)(iii), (2)(D))). But, as the *Brodsky* court explained, "[t]he absence of a specific cite to the Solicited Fax Rule itself cannot be read out of context. The portions of the TCPA cited at this point in *Turza* never mention solicited messages at all; instead, they refer to the FCC's ability to promulgate additional rules regarding opt-out notices (such as the Solicited Fax Rule)." *Id.* (citing *Turza*, 728 F.3d at 683 & 47 U.S.C. § 227(b)(1)(C)(iii), (2)(D)). Moreover, the statement in *Turza* on which plaintiffs rely

7

is "nonbinding dicta." *Id.* at *9. *Turza* did not even involve solicited faxes; "[t]he only question on the merits [wa]s whether" unsolicited faxes "contained ads." *Turza*, 728 F.3d at 685.

Like the *Brodsky* court, this Court "declines to afford *Turza's* non-precedential dicta a reading that would improperly expand the TCPA." 2017 WL 3704824 at *8. As federal courts across the country agree, "while 'the [TCPA] requires an opt-out notice on unsolicited fax advertisements, the [TCPA] does not require a similar opt-out notice on *solicited* fax advertisements.'" *Id.* (quoting *Bais Yaakov*, 852 F.3d at 1081 and collecting cases) (emphasis in original). "In addition to running contrary with this precedent, [plaintiffs'] argument is in tension with: (1) the TCPA's plain (and thus controlling) text, *see generally* 47 U.S.C. § 227 *et seq.*; and (2) guidance from the FCC, which implicitly presumes that the opt out notice requirement is imposed on solicited faxes solely by virtue of the Solicited Fax Rule—not the TCPA itself." *Id.* Thus, "[i]n the Seventh Circuit, as in the rest of the country, the TCPA itself does not require that opt-out notices be included on solicited faxes—notwithstanding a missing citation in *Turza*." *Id.*

Plaintiffs emphasize that two other courts in this district have cited *Turza* for the proposition plaintiffs advance here. *See Orrington v. Scion Dental, Inc.*, 2017 WL 2880990, at *2 (N.D. Ill. July 6, 2017); *Physicians Healthsource, Inc. v. Allscripts Health Sols., Inc.*, 2017 WL 2406143, at *24 (N.D. Ill. June 2, 2017). This Court, like the *Brodsky* court, "respectfully disagrees" with those courts. *See* 2017 WL 3704824 at *9 n.2 (citing *Orrington*, 2017 WL 2880990, at *2 and *Physicians*

*Healthsource*, 2017 WL 2406143, at *24). The holding in *Bais Yaakov* striking down the Solicited Fax Rule is controlling here. And even if it was not controlling, this Court finds its holding persuasive and would follow it.

### 2. Impact of Individualized Consent Issues on Predominance and Superiority

As this Court has already determined, plaintiffs' class claims "center on whether Defendants included a proper opt-out notice on their faxes." R. 33 at 14. In its motion to dismiss ruling, this Court redefined the Alpha Tech class to include members who received solicited faxes in order to avoid a fail-safe class problem. R. 33 at 16. The Craftwood class likewise does not exclude members who received solicited faxes. *Craftwood* Dkt. 1 ¶ 19. "The TCPA, however, does not impose an opt-out notice requirement on 'solicited' faxes," and, after *Bais Yaakov*, neither does the Solicited Fax Rule. *Brodsky*, 2017 WL 3704824, at *10. "Thus, to determine whether any putative member of the proposed class had a TCPA claim, the Court would first be required to determine whether that proposed class member 'solicited,'" or consented to, "the faxes it received." *Id.*

Both courts and the FCC have found the question of consent to receive faxes to be context-dependent. The *Brodsky* court explained that "[a]s a doctrinal matter, consent is dependent on the context in which it is given." 2017 WL 3704824, at *5 (quotation marks omitted). And in a 2015 Order, the FCC instructed that the "scope of consent must be determined upon the facts of each situation." Order, 30 FCC Rcd. 7961 ¶ 49 (July 10, 2015).

Numerous courts have found that context-dependent questions regarding consent "preclude certification under Rule 23(b)(3)" on predominance or superiority grounds. *E.g.*, *Sandusky*, 863 F.3d at 466 (individual consent issues "keep common questions from predominating"); *Brodsky*, 2017 WL 3704824, at *10 ("individual consent issues defeat predominance and superiority, such that class treatment is no longer warranted under Rule 23"); *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 329 (5th Cir. 2008) (individual consent issues defeated predominance); *Simon v. Healthways, Inc.*, 2015 WL 10015953, at *8 (C.D. Cal. Dec. 17, 2015) (individual consent issues meant that "class action [wa]s not superior to individual suits"); *G.M. Sign, Inc. v. Brink's Mfg. Co.*, 2011 WL 248511, at *9 (N.D. Ill. Jan. 25, 2011) (in light of individual consent issues, "the Court cannot conclude that the proposed class meets the predominance condition"); *see also Clark v. Experian Info., Inc.*, 233 F.R.D. 508, 511 (N.D. Ill. 2005), *aff'd sub nom. Clark v. Experian Info. Sols., Inc.*, 256 F. App'x 818 (7th Cir. 2007) (superiority and predominance inquiries are often related because "[i]f individual issues predominate, then class certification is usually not a superior method for resolving the controversy, since management of such issues by a court will not be efficient").

This is not, however, an automatic conclusion. As the *Brodsky* court explained, defendants must "set forth 'specific evidence showing that a significant percentage of the putative class consented' to the communication at issue" before a court can find that "issues of individualized consent predominate [over] any common questions of law or fact.'" 2017 WL 3704824, at *5 (quoting *Physicians*

*Healthsource, Inc. v. A-S Medication Sols. LLC*, 318 F.R.D. 712, 725 (N.D. Ill. 2016)); *accord Jamison v. First Credit Servs., Inc.*, 290 F.R.D. 92, 106-07 (N.D. Ill. 2013) ("issues of individualized consent predominate when a defendant sets forth specific evidence showing that a significant percentage of the putative class consented to receiving calls on their cellphone," but "if the defendants fail to set forth this specific evidence and instead only make vague assertions about consent, then individualized issues regarding consent will not predominate") (collecting cases). Evidence of consent can come in many forms. The FCC allows consent to be obtained "orally" or "in writing" through forms "including e-mail, facsimile, and internet." Junk Fax Prevention Act of 2005, 71 FR 25967-01, 2006 WL 1151584.

Here, defendants set forth several different types of consent-related evidence: (1) 5,281 consent forms from Essendant customers agreeing to receive faxes (R. 71-2 ¶¶ 25-27 & Ex. 8); (2) entries in Essendant's Trend database showing more than 25,000 fax numbers for which a consent form was collected from a customer and a declaration from Essendant Director of Sales Jon Phillips explaining the reasons why the Trend database may underreport consent (R. 71-2 ¶¶ 29-32); (3) a description by Phillips of Essendant's practice of advising customers at the inception of the customer relationship about the option to receive Essendant faxes and requesting that customers provide fax numbers for that purpose (R. 71-2 ¶¶ 23-24); (4) a description by Phillips of Essendant's practice of obtaining consent from some customers orally (R. 71-2 ¶ 27); and (5) by way of example, declarations from 25 Essendant customer fax recipients who consented to receive faxes (including

advertising faxes) but are not reflected in the Trend database as consenting and for whom consent forms have not been located (R. 71-2 ¶ 33 & Ex. 9).

This is "concrete evidence of consent." *See Sandusky*, 863 F.3d at 469. Defendants have provided evidence that many thousands of potential class members provided a consent form or are shown in the Trend database as having consented. *Compare id.* at 468-69 (evidence that "several thousand" fax recipients are "current or former [defendant] customers," many of whom provided consent forms, constituted "concrete evidence of consent"). And defendants have provided the same types of evidence that other courts have looked to when evaluating whether individualized consent issues make class certification inappropriate. *See, e.g.*, *Simon*, 2015 WL 10015953, at *5-6 (defendants produced a variety of forms of evidence of consent for faxes, including oral consent, consent when joining the network, and consent when registering online); *Gene & Gene*, 541 F.3d at 328-29 (employee testimony showed that defendant's "database entries do not consistently or accurately reflect whether a given recipient had consented" to faxes); *Jamison*, 290 F.R.D. at 107 (affidavit from defendant employee explained issues with consent tracking through defendant's account record system and practice of obtaining verbal consent in TCPA debt collection class action).

Like in *Sandusky*, the evidence produced by defendants shows that assessing consent would require "manually cross-checking" the thousands of identified "consent forms" and 25,000 fax numbers in the Essendant Trend database "against the [many thousands of] potential class members." *Sandusky*, 863 F.3d at 468-69.

Such "a form-by-form inquiry" alone "is sufficiently individualized to preclude class certification." *Id.* at 469.

And there are other factors in this case that would make the consent determination even more involved. As Phillips explains in his declaration, the Trend database "was not a perfect system." R. 71-2 ¶ 29. "Due to the manual nature of updating the Trend database, a 'No' in the consent field does not necessarily indicate that a customer had not provided a Consent Form." *Id.* ¶ 30. "Nor does the 'No' field mean that a customer had not agreed or expressed a desire through other means to receive faxes." *Id.* This is evidenced by the 25 Essendant customers who signed declarations stating that they consented even though Essendant could not locate consent forms for them and they are not identified in Trend as providing consent. *Id.* ¶ 33 & Ex. 9.

The issues with solely relying on the Trend database do not end there. "There are more than 1,400 instances in which Essendant has located a Consent Form, yet the fax number at issue does not appear in Trend." *Id.* ¶ 30. Sometimes, "the Trend Field for a customer consent indicates a 'Yes,' but the fax number associated with that Consent Form . . . subsequently changed." *Id.* ¶ 31. And "[t]here are also many customers who have multiple fax numbers, . . . but Trend is limited to including a single fax number per customer. Thus, there are instances in which Essendant has a record of consent at the customer level that does not capture additional fax numbers for such customer." *Id.* ¶ 32.

In addition to the issues with the Trend database, "[a]n unknown number of Consent Forms and other records of consent were destroyed . . . in August 2005 when one of Essendant's New Orleans, Louisiana facilities was damaged by Hurricane Katrina," including "binders" of such forms that Phillips "personally saw." *Id.* ¶ 28. And "Essendant also maintains thousands of customer account files . . . which, if individually searched, may reveal further evidence of prior express permission." *Id.* ¶ 34.

Taken together, this evidence means that for each putative class member, the Court would have to undertake an inquiry as to whether that member provided a consent form, was marked as having consented in the Trend database, or otherwise consented, including orally or as reflected in the customer account file. An "evaluati[on] of the specific evidence available to prove consent" thus reveals numerous individual questions that spell doom for plaintiffs' proposed classes. *See, e.g.*, *Brodsky*, 2017 WL 3704824, at *5.

In their response, plaintiffs do not meaningfully contest that—if this Court finds *Bais Yaakov* controlling, which it does—consent would be an individualized issue. Instead, plaintiffs focus on a few of the forms of consent-related evidence provided by defendants. Plaintiffs first take issue with Essendant's consent forms. They say the consent forms do not comply with Paragraph 193 of the regulations implementing the TCPA by specifying that consent extends to "fax advertisements." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 FCC Rcd. 14014, ¶ 193 (July 2, 2003). But Paragraph 193 is part of a

section titled "Membership in a Trade Association" that addresses procedures for consent when "a company wish[es] to fax ads to consumers whose numbers are listed in a trade publication or directory." *Id.* ¶¶ 192-93. This case does not involve faxes sent to numbers listed in a trade publication or directory. Paragraph 193 therefore does not apply. And, in any event, the consent forms produced can be fairly understood to cover all faxes sent by defendants, including advertisements. *See* R. 71-2 Ex. 8 ("I understand that by providing the fax number(s) above . . . I am authorized to and hereby consent for the company/organization to receive faxes sent by or on behalf of [defendants]").

Plaintiffs also say that the 5,281 identified fax recipients with consent forms easily can be excluded from the class. But because "[a]n unknown number of Consent Forms and other records of consent were destroyed" during Hurricane Katrina, *id.* ¶ 28, simply excluding these identified recipients would not eliminate the question of who signed a consent form—not to mention the numerous other individual questions bearing on consent described above.

Plaintiffs next ask the Court to disregard the declarations from 25 Essendant customers stating that they consented to receive Essendant's faxes, including advertising faxes. *Id.* ¶ 33 & Ex. 9. Plaintiffs say there is no proof that these 25 customers are class members. But plaintiffs are using fax transmission records provided by Essendant to identify their purported classes, and all of the declarants are among those listed in the fax transmission records. *See* Dkt. 71-2 Ex. 6. Plaintiffs also suggest that the declarations may not be admissible because they

sometimes use the word "we" and thus fail to establish the declarant's personal knowledge. R. 96 n.11. This is a weak argument, but even if it were correct, the Court may consider inadmissible evidence in determining whether to certify a class. *E.g.*, *Young v. Fortis Plastics, LLC*, 294 F.R.D. 128, 135 (N.D. Ind. 2013).

Finally, plaintiffs ask the Court to reopen discovery and take depositions if it finds that they have not met their burden on class certification. But this Court has already adopted Magistrate Judge Valdez's order declining to reopen discovery. As this Court explained in the course of adopting that order, "plaintiffs have said repeatedly it would be . . . 'breathtaking' to consider a class certification issue without depositions being taken. The truth is it's breathtaking that nobody took depositions before the discovery cutoff. That's the breathtaking part. And if you don't, you've got to live with the consequences." R. 95 at 6.

Moreover, and crucially, plaintiffs have not identified any specific, further discovery they could take that would change the Court's conclusions regarding class certification. Plaintiffs make much of the fact that the Craftwood entities allegedly were not Essendant customers and did not consent to the faxes they received. They request further discovery "to investigate and cross-examine Defendants' witnesses . . . about their assertion that they have sent fax blasts only to customers." R. 96 n.13. But defendants do not need to show that *all* potential class members were consenting customers to demonstrate that consent is an individualized issue. They simply need to establish "concrete evidence of consent" by a significant portion of the class, *Sandusky*, 863 F.3d at 469, which they have done. The fact that the

Craftwood entities did *not* consent, if true, further establishes the individualized nature of the issue.[2]

Numerous courts have found predominance or superiority not met where consent-related "questions suggest that [any] trial . . . will be consumed and overwhelmed by testimony from each individual class member, in an effort to determine whether the class member consented to receive the messages in question." *Brodsky*, 2017 WL 3704824, at *5 (quotation marks and alterations omitted); *accord Sandusky*, 863 F.3d at 468 ("if Sandusky's 40,343-member class were certified, the district court would be tasked with filtering out those . . . individuals who solicited" the faxes in question); *Simon*, 2015 WL 10015953, at *8 ("The Court cannot and will not engage in hundreds of mini-trials to determine whether a putative class member provided Defendants his or her or its prior express permission."); *G.M. Sign*, 2011 WL 248511, at *9 (denying class certification where it "seems unavoidable that the Court would have to conduct a series of mini-trials to determine . . . consent").

---

[2]    Elsewhere in their filings, plaintiffs propose proceeding by subclass. But the subclasses they suggest do not differentiate based on forms of consent; they differentiate by fax content. *See, e.g.*, R. 96 at 4. Plaintiffs do not show why fax-content-based subclasses would do anything to impact the individualized consent issues in this case. And even if plaintiffs did try to differentiate based on forms of consent, the Court finds that proceeding by subclass would be untenable for the same reasons described in *Sandusky*. *See Sandusky*, 863 F.3d at 470 ("To even create subclasses would have required the district court to analyze each individual form, and further assumes that the forms could be easily categorized. And after this painstaking sorting process, allowing Sandusky to then litigate the validity of consent as to each subclass would result in the exact myriad mini-trials that Rule 23(b)(3) seeks to prevent.").

Just as in these cases, the Court finds that individualized consent issues would require a series of mini-trials, thus defeating predominance and superiority. "Regardless of other questions that may be common to the class, identifying which individuals consented would undoubtedly be the driver of the litigation." *Sandusky*, 863 F.3d at 468. The Court therefore grants defendants' motion to deny class certification (R. 70).[3] Because the Court finds that predominance and superiority are not met, it declines to address defendants' alternative arguments regarding class ascertainability and the typicality and adequacy of the class representatives under Rule 23(a).

## II. Motion for Judgment on the Pleadings

### A. Standard

---

[3] Even if *Bais Yaakov* were not controlling here, there is an alternative basis for this Court's class certification holding. Defendants applied for and were granted a waiver from the Acting Chief of the Consumer & Governmental Affairs Bureau (through authority delegated by the FCC). This retroactive waiver excused defendants from the opt-out notice requirements for those faxes for which defendants had prior express permission. Plaintiffs in their surreply in opposition to defendants' motion for judgment on the pleadings (R. 108-1) argue that this waiver should not be relied on because plaintiffs filed an application for review of that waiver several years ago, which the FCC has not yet decided. R. 96 at 16. But the implementation of a Consumer & Governmental Affairs Bureau decision need not be deferred until the FCC rules on a petition for review. *See Committee to Save WEAM v. FCC*, 808 F.2d 113, 119 (D.C. Cir. 1986). Unless the FCC grants plaintiffs' application and overturns defendants' waiver, that waiver serves as an independent basis for this Court's finding of individualized consent issues that defeat predominance and superiority. *See Brodsky*, 2017 WL 3704824, at *4-10 (class certification inappropriate both under *Bais Yaakov* and because defendant's retroactive waiver "suspended the Solicited Fax Rule with respect to the faxes at issue," creating individualized consent issues); *Simon*, 2015 WL 10015953, at *7-8 (retroactive waiver created individualized consent issues defeating class certification).

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment after the parties have filed the complaint and answer. *Buchanan–Moore v. County of Milwaukee,* 570 F.3d 824, 827 (7th Cir. 2009). A Rule 12(c) motion is subject to the same standard as a Rule 12(b)(6) motion. *Id.*

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). This "standard demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel,* 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal,* 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the nonmoving party. *Id.*

### B. Application

The Alpha Tech plaintiffs' complaint and the Craftwood plaintiffs' complaint assert two claims or theories of TCPA violations: (1) that Essendant sent faxes without prior express permission; and (2) that regardless of prior express permission, Essendant failed to include proper opt-out notices on advertising faxes. *See* Craftwood Dkt. 1-1 ¶¶ 28-35 (Count I addresses "Defendants' Violations of the Prohibition on Unsolicited Facsimile Advertising" and Count II addresses "Defendants' Violation of Opt Out Notice Requirements"); R. 1 ¶¶ 27-30 (making separate allegations as to violations of prohibitions against unsolicited advertisements and violations of "Opt-Out Notice Requirements"). Defendants seek judgment on the pleadings with respect to part of the second, opt-out notice theory. Specifically, they maintain that after *Bais Yaakov*, opt-out notices are not required for fax advertisements sent with prior express permission.

Plaintiffs argue that it is procedurally improper for the Court to award judgment on the pleadings on part of a claim. Plaintiffs are correct. "A motion for judgment on the pleadings under Rule 12(c) . . . is governed by the same standards as a motion to dismiss for failure to state a claim under Rule 12(b)(6)," and "[a] motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) (quotation marks and citations omitted).

Defendants cite older, district court cases for the proposition that "judgment on the pleadings with respect to a part of a claim" is proper, *e.g.*, *Chi-Mil Corp. v. W.T. Grant Co.*, 70 F.R.D. 352, 357 (E.D. Wis. 1976), but this Court is bound by the Seventh Circuit's more recent opinion in *BBL*.

Defendants further argue that they are seeking judgment on the pleadings with respect to plaintiffs' opt-out notice claims in their entirety. But a close reading of the complaints shows that defendants' motion applies only to part of plaintiffs' opt-out notice claims (that is, the theory that opt-out notices were necessary even for faxes sent *with* prior express permission). It leaves untouched the part of plaintiffs' opt-out notice claims applying to faxes sent *without* prior express permission. *See, e.g.*, R. 1 ¶¶ 15-16 ("Defendants faxed . . . unsolicited facsimiles without the required opt out language to Plaintiff . . . without first receiving . . . express permission or invitation.") and Craftwood Dkt. 1-1 ¶ 33 (alleging for faxes sent both with and without prior express permission that "Defendants violated the TCPA and FCC regulations promulgated under the Act by . . . transmitting advertisements that failed to comply with the Opt-Out Notice Requirements"). For that reason, plaintiffs are correct that granting defendants' motion would require the Court to enter judgment on the pleadings with respect to parts of plaintiffs' individual claims. Because this would be procedurally improper, defendants' motion (R. 67) is denied.

The Court does, however, repeat the legal principle that should already be apparent from its ruling on class certification: after *Bais Yaakov*, named plaintiffs

may no longer seek relief based on the TCPA's opt-out notice requirements for faxes sent with prior express permission. As plaintiffs point out, this principle may well prove irrelevant to plaintiffs' remaining, individual claims if their allegations that they did not give prior express permission prove correct. *See* R. 1 ¶¶ 15-16 and Craftwood Dkt. 1-1 ¶ 13 (alleging no prior express permission for any of the faxes named plaintiffs received).

## Conclusion

For these reasons, the Court grants defendants' motion to deny class certification (R. 70), and denies defendants' motion for judgment on the pleadings (R. 67).

Plaintiffs also filed a motion to grant class certification (R. 97) on which this Court held briefing in abeyance pending its decision on defendants' motion to deny class certification. For the same reasons that defendants' motion to deny class certification is granted, plaintiffs' motion for class certification (R. 97) is denied.

ENTERED:

*Thomas M. Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: November 3, 2017